May it please the court, my name is Wayne Young and I represent Mr. Watts who has appealed the denial of his § 2254 petition. I intend to focus primarily on the juror misconduct issue today, but of course welcome any questions on the Bruton issue, but it seems the juror misconduct issue goes more to the heart of this appeal. And the first question is, is there a presumption of prejudice from the evidence of the misconduct? It's clear that this newspaper article went into the jury room. I think the gravamen in my complaint is that there was not much of an inquiry into the consequences of that. So there's a presumption of prejudice or the implied bias arise from that. The California Court of Appeals said there is a presumption of prejudice. There seems to be more of a debate in the federal law about whether that presumption of prejudice still applies. It did in Remmer. There's argument that the Smith case that came in the 80s seemed to pull back from that. So the dividing line to me seems to be that the Remmer presumption applies is either intentional tampering, which we don't have here, or really aggravated circumstances or exceptional circumstances. And so my position is there is a presumption of prejudice because the exceptional circumstances here is that the information in the article is so prejudicial that it creates the presumption of prejudice. Counsel, if we disagree with your analysis that there's a presumption of prejudice, how would you convince us nevertheless to grant you relief? That's a burden. But even without the presumption of prejudice, I think it's clear that there has to be a hearing. Well, it doesn't have to be a hearing, but if you bring these allegations forward, there has to be an inquiry of some kind. And these facts are sufficient to require a hearing, a prima facie case. So you have the hearing. You don't have a presumption of prejudice. And then that gets to, I think, the principal point on appeal is the adequacy of the court's inquiry into the misconduct. And the cases hold that there must be an inquiry reasonably calculated to explore the juror's misconduct. And I think that's we can all agree on that. There has to be a reasonable inquiry. The real question is whose burden of it is it to conduct that inquiry? Our position is that the burden fell on the trial court. And the Court of Appeals, the State Court of Appeals' position was that the burden really fell on the defendant. And I think it falls on the court in this case, a unique situation, because it has to do with juror misconduct. If it had to do with misconduct, say, of an agent turning over his notes or something, I think defense counsel would have to drive that. Okay, counsel, before you go any further, are you saying the state trial court hearing on the issue was inadequate? Yes, I am, Your Honor. In what way? It was extremely brief. Here's what I think should have happened. Defense counsel, by bringing the article up, made the prima facie case. That triggers the duty of the court to make a more thorough investigation, because this article is so prejudicial. I mean, with the evidence of the... Well, let's say prejudicial. Whether it's so prejudicial is a question that the fact that jurors might have been influenced the other way, saying this was just an ATM machine, this man has had this record, maybe we should go easy on him because we don't want to punish him so much because of it. So it's prejudicial, but I just disagree that it's so prejudicial. And my point is we don't really know, because the court didn't make the inquiry to respond to your question. But the court should have done, having seen the article... How did the court do, first of all? The court agreed to have a hearing, let the defense counsel put on the hearing as he wished. He called one juror, asked a few perfunctory questions, and the court only asked one or two questions. What juror did he call? Juror number one. Why was juror number one called? Juror number one was also the juror who was the subject who knew, at least had some connection to the defendant. It came out in trial that juror number one knew the family of the defendant, didn't know that until subsequently, and that became an issue. But that's why I think juror number one was called. Counsel, defense counsel, through his relationship... This was not the juror who originally was voting for not guilty. It's the same juror, it is. So having brought the article... Don't you think that was the reason? I take it you were not the defense counsel. I was not, Your Honor. He wanted to see the swing juror, whether he was affected by this newspaper article. That's certainly what... That sounds like a good approach, doesn't it? It's a good start. And then the question that I'm raising is, the juror comes in, testifies, there was a newspaper article, and it was in the room. I don't really remember the details of how much we got into that. And then the article is prejudicial, and I think it's relevant about how prejudicial. That triggers the duty on the trial court to go further. All right, now let's find out, what did this juror say? Did not the juror say, it didn't affect my vote one way or the other? That's what that juror said. That's correct. All right, so as far as that witness is concerned, you have no problem. Now, are you criticizing defense counsel for not calling other jurors? I certainly think he could have done a better job of really being critical of the trial court for not... All right, wait a minute now. Here is a defense counsel in a case where a guilty verdict has been rendered, and I'm going to upset this by showing that the jury was improperly influenced by this article. And he calls one juror. Now, are you saying that the judge should have called the other jurors rather than the defense counsel? Yes, sir, that's what I'm saying. The article comes in, and you see the contents of the article, and it's inconclusive, really, what happened from investigating this one juror. The duty now is triggered to the trial court to have a more thorough inquiry. Counsel, what's your best case authority for that proposition? Two, Your Honor. Neither of them, I think, are cited in the briefs, unfortunately. One is Dyer v. Calderon, which wasn't cited because it was a pre-ADPA case, and writing the brief, I was focusing more on ones that came after it. But there's a discussion there between Judge Kaczynski and Judge O'Scanlan about... Can you give us the citation? Yes, sir. 151, Fed 3rd, 970. And there's a discussion in there about the duty of the court, if presented with sufficient evidence of jury tampering, or not jury tampering, jury misconduct, that triggers on the court the obligation to inquire further. Another one, much more recent, out of the First Circuit by Judge Selya, is Bradshaw, 281 F. 3rd, 291. It has a lengthy discussion of this duty of the trial court. If you can make that sufficient... Could you be more specific and help us out? Give us the language. I can, Your Honor. The Ninth Circuit case does not help me very much because I do not know the facts. I'll read the case. I'm quoting on page 978. It's a case involving juror misconduct. Given the extremely delicate situation where a juror is suspected of prejudice or misconduct, the trial judge must assume, quote, the primary obligation to fashion a responsible procedure for ascertaining whether misconduct actually occurred. Now, who committed the misconduct here? The juror who brought the newspaper into the jury room, which is not the juror that was put on the stand. Why didn't the defense counsel present him? I wish he had. He did not. And my case... And so because he didn't, then the court heard because the defendant did not bring in a person accused of jury misconduct. Only in this... That's the rule. That's the rule. I am, Your Honor, based on this Ninth Circuit case, that because of the delicate nature of juries, you know, there's an instruction in California that follows the trial about if you even get approached by counsel. So certainly before verdict of jury misconduct comes to the attention of the court, it's the judge who conducts the voir dire. And it puts counsel in a difficult situation to... I think he can, but the obligation triggers to the trial judge is our argument. Okay, but you represented to us earlier that the trial judge essentially said to defense counsel, go ahead and call juror number one, and if you will... And I believe you said counsel was permitted to introduce any other evidence that he might want to permit. So clearly at that point, he had the permission of the court to contact members of the jury. He did, Your Honor. Why is it a due process violation if the judge didn't assume a more active role if he'd done that much? I'm only arguing this in the context of jury misconduct, not any other situation. Well, let me tell you what's troubling me. I mean, it seems like we'd have a very different case if the judge had done nothing and had simply said, you know, I don't care. You haven't supplied us with any declarations from any jurors who say they were influenced by the article. He did hold a hearing, and he did take testimony from one of the jurors. Yes, sir. And as I understand your argument in response to Judge Aldister's question, you think he should have called the other 11 as well. Or at least some of them. But that's the position, Your Honor. Because of the just, and it's in the dire case, the delicate, peculiar nature of jury misconduct. I remember the facts in dire, although I have read it fairly recently for another case. But was there any hearing conducted whatsoever in that case? I'm not sure, Your Honor. I don't recall off the top of my head, but the strength of our argument is if this duty was triggered, then the investigation was inadequate. I'm sending for the Ninth Circuit case. Was that a 2254 case? It was, but it was pre-AEDPA. But in thinking it through, I don't see any reason why that principle should have been changed by AEDPA. The Supreme Court has recently reminded us that AEDPA did change our powers on review of state court determinations. And I guess the question here is, was it an unreasonable determination for the California Court of Appeals to decide that, A, the inquiry that the trial court conducted was adequate, and, B, there was no prejudice to the petitioner because he was caught red-handed during the commission of the burglary? I think our argument arises under the unreasonable determination of facts clause. And it would be that in the absence of a thorough hearing, the facts can't have been reasonably determined. And I think that's what Dyer suggests. Now, do you want to address the harmless error aspect of it? Well, if I start out with a presumption of prejudice and an inadequate hearing, that's the strong argument. Pure harmless error, in this case, is the thinnest of defenses. Those are the facts. I have to be candid about it. What did you just say? It was a very thin child defense, Your Honor. So on traditional harmless error analysis, for me to prove that this was not prejudicial. Here, under the concept of aiding and abetting, this man did not go in and remove the ATM. Is that right? Yes, but as Mr. Tedder pointed out, even under, you know, there's an aiding and abetting for burglary, so it's a... So, and that's why I get... There's a gang who couldn't steal straight. They take this ATM and they go through the carpeting. They see the wheels. The security people hear the sound that someone had tampered with the ATM. They see the wheels on the carpeting. They follow the tracks. And they go out and see these people lifting an ATM, including your man, lifting the ATM into a van. In his pocket is a wrench that fits the removal of the bolts where the ATM was anchored, and there is evidence, eyewitness evidence that he was one of the persons lifting up. Now, under those facts, let's talk about harmless error under the correct analysis. I think that's why, as I did in the brief and I am now, this case moves towards the spectrum of the structural error, because that's really realistically what I need. You know, the one response on the harmless error is if you go through those factors that are laid out in the Dixon case, and I think in the Jeffrey B. Woods case, you look at the material and how long it was available to the jury, how often the jury discussed it, whether it was introduced before a verdict was reached, whether it was ambiguous. You apply all those, and I meet those factors all the way. Okay, but I think what your argument is going down to, based on what you just said, is... Where's the harm? Yeah, but you either win or lose on the structural error analysis. In other words, you want us to declare that there was prejudice in violation of the due process clause no matter what, because you can't win on harmless error. I think I have to concede that. It's a little stronger than I want to go, but... I didn't want to be painted into that corner, but I think you've done it. And that's why I did in the brief and now argue this moves towards the spectrum of harmless error, and this perhaps is where the Bruton issue at least works its way in. You have an egregious, even the Court of Appeals found an egregious Bruton by-law. But counsel, I mean, do you really need the testimony of one of the other three to say, not only did you catch us doing it red-handed, but we were doing it? It certainly was the clincher. But you're still stuck back with the facts and the defense. The security guards, we caught them doing it. So you add that. But I think the crux of the argument becomes there's a cumulative impact of that, but we really don't know what impact this article had the jury because the inquiry wasn't made, and in the absence of that knowledge, it's a fundamentally flawed trial. I think that you want to say the rest of your time. I will. Thank you, Your Honor. Thank you. Good morning, Your Honors. I was going to begin by briefly reviewing the facts, but I believe Judge Aldershart did a good job in reviewing those facts to show that in fact the defendants in this case were caught red-handed. We understand the facts very well, so why don't you address the harder issue, which is the issue Mr. Young posits that the Superior Court judge should have done more than he did on the hearing. Well, the Superior Court held a hearing and had one of the jurors testify as to what he observed regarding the newspaper, and essentially what he stated was he saw another juror bring the newspaper article in and a third juror asked to see the newspaper, but he doesn't know whether or not he actually saw the article itself and the article wasn't discussed. The article was before the judge, and after the judge heard the testimony from this juror and presumably looked at the article, the judge decided that there wasn't any need for anything more, and although it's not stated explicitly on the record, I'm sure that the judge's reason in looking at it and in evaluating the evidence was there was no need for any additional inquiry because what is stated in the newspaper article could in no way have affected the deliberations of the jury or affected the verdict. It could have in no way affected the deliberations of the jurors if we only had one juror testify. Well, that juror said that the article was never discussed in deliberations, but I guess more importantly what I'm trying to say is even if the article had been read and considered by more than one juror, the evidence was so overwhelming that it was not the sort of thing that would have influenced the jury's verdict. You are turning us toward a harmless error analysis as opposed to a structural error analysis. Well, yeah, I don't believe there is structural error, and I guess going back to the point I was trying to make was whether or not the judge made an adequate inquiry. I think it did because I think what it implicitly decided was I have heard testimony, I have done investigation into this juror misconduct, and I can find that based on what's in front of me and based on what defense counsels presented, there's no way that this could have been at all prejudicial. Who presents case authority for the fact that an implicit decision by a court is sufficient? Well, I don't have a case that states that, but what I do have are cases which I cited in my brief that basically state that we give trial courts room and discretion to decide how much investigation or how much inquiry is necessary when looking into juror misconduct. I don't know if we can tell from the record, but we can't tell from the record why the trial court limited its inquiry to one jury, to one juror, can we? Well, I think the natural inference would be that based on everything that the court had before it, that it determined that there was nothing there that required any further investigation. How do we get around our case law that says that we presume prejudice where a juror finds out that the defendant has previously been convicted of related crime? And here the article said it would be the third strike for Watts, who was convicted of two burglaries, four robberies, and two rapes, all in the 1980 case. And then we have another case that says we presume prejudice if the jury finds out what the punishment is. And the article goes on to say, but they went to trial anyway, probably because if Watts is convicted, he faces 26 years to life in prison under the three strikes law. Now, we know that at least one juror read that article because she was the one who brought it into the jury room, don't we? Yes, we know at least one article read it, that's right. Now, based on our case law, mustn't we conclude that Mr. Watts was deprived of his due process right to a fair and impartial jury because it had been tainted by knowing those two pieces of impermissible information? Well, what I'd like to do is take the court back to the AEDPA standard because the state court here did in fact presume prejudice. So they didn't do anything inconsistent with the law. And after presuming prejudice, they then determined that based on the facts, they couldn't find that there was any prejudice. And they would presume that there was jury tampering, or not jury tampering, jury misconduct, but they couldn't find that there was any prejudice given the facts of this case. So it's not a, we don't have a per se rule of prejudice. We look at whether or not the state courts unreasonably applied Supreme Court law or contradicted Supreme Court law. And the state court here presumed prejudice and then analyzed the facts and found that there could have been no prejudice. And so under the AEDPA standard, I think the state court acted properly both in determining that there was no prejudice and also in determining that the trial court conducted an adequate investigation. There is no Supreme Court law that states that a trial court, in a circumstance like this where we have this misconduct where we know one juror read an article, the trial court conducts a certain amount of investigation and then determines implicitly that, okay, there's nothing more needed. We don't have any Supreme Court law that mandates that the trial court take any further action. It held adherent. It exercised its discretion and decided that was enough. So I think the California Court of Appeal, when it determined that the trial court acted properly, did not unreasonably apply or contradict Supreme Court law. And same with the prejudice analysis. I think the trial court, excuse me, the California Court of Appeal acted properly in that regard. And I might also just add, as far as the prejudice standard here, we're looking at Brecht v. Abrahamson, which is whether or not the errors could have had a substantial and injurious effect or influence on the verdict. This is a lesser standard than the Chapman standard. And I think in any analysis of prejudice, given the facts of this case, there is simply no way that we could find that these errors were prejudicial. Where did I get the information that at the time the newspaper was brought into the jury room, the jurors were divided 11 to 1 for guilty? Where did I get that information? Was that brought up at the hearing? It was brought up, and I believe that was at the hearing, that the juror who testified at the hearing, who said he saw the newspaper article come in, said that he was the sole not guilty vote. But he said that the reason he voted not guilty was because of the circumstantial evidence instruction, that he misunderstood it. And I think the inference was that perhaps what this juror thought was you couldn't convict based on circumstantial evidence alone. And in this case, as we know, it was circumstantial evidence. From a temporal aspect, what did he exactly say about the vote? Was the vote taken before the paper was brought in? I don't recall, Your Honor. And my memory is that there wasn't specific testimony as to the timing of the vote versus when the newspaper article came in. I don't remember that being in the record, although I could be mistaken. Nonetheless, I think that given his explanation of why he voted not guilty, it appears it was unrelated to the newspaper article. In fact, I believe the juror said... Was the deliberation, did the deliberation take just one day? Yes, I believe that they deliberated at the end of the first day and came back the second day and reached a verdict later that second day, if I remember correctly. Two days. I'm not positive about that. I don't recall for sure. I think that that was the scenario in this particular case. You think what? I think that was the scenario in this case where they deliberate at the end of the day and then the beginning of the second day, but I'm not positive. Well, that would be two days. That would be two days under the circumstances, yes. Now, on what day was the paper brought in? I don't recall. Nevertheless, I would just submit that here the juror testified that the newspaper article never entered into the deliberations and he never saw any jurors reading it. So I think that despite how long the newspaper article was actually available to jurors or there, the testimony showed that it really wasn't considered in any event and nobody was reading it. So I don't know if, in fact, it was present from the very beginning of deliberations or... Is that right? I thought he testified that he had overheard or seen another juror ask the juror who brought the newspaper in to see it and that he saw that other juror thumbing through the newspaper but not necessarily reading the article. That's right, Your Honor. And if I said anything contrary to that, I misspoke. He didn't see this other juror, second juror, reading the article. He apparently asked to look and thumb through the newspaper. The only person he actually saw reading or not even he didn't see them reading the article but that he was aware that somebody knew the content of the article was the person who brought the newspaper in. Unless there are any other questions, I will submit it. All right. Thank you. Mr. Young? Just on the temporal timeline, Jan, it was the 4th that the jury retired to deliberate and it was at 3.50 p.m. And the article was also written on the 4th. So it would have had to have been sometime between 3.50 and 5 p.m. that day that the article was read. They didn't reach a verdict. They came back the next day at 9.30, had a verdict before noon. Well, wait a second. Are you saying there was testimony to that effect? Or because isn't it just as likely that the juror could have brought the article in the next morning? It could have. I suppose if it was lying around the courthouse, that's a possibility. But the article was brought at home and brought it to the courthouse to look at. You're right. That's a possibility. I had thought because it was dated the 4th and that's when the jury went to deliberate, it would have had to have been that day. But I suppose there's a scenario in which it wasn't. And then on the issue of the other thing on the timeline is the first vote was not guilty. Was not guilty? For the one juror voted not guilty. So that goes to the point that I think there was at least a coincidence of the time changing his vote subsequent to seeing the article. The testimony was that he changed his vote because he didn't understand the law of circumstantial evidence. That's correct. So we don't have anything in the record that negates that finding. We do not. All right. Thank you. Thank you, both counsel. The case just argued is submitted. And we'll hear argument in the last case on the calendar. Congregation versus the city of Los Angeles. Good morning. I'd like to reserve five minutes of my time for rebuttal. Once you have any questions, I'll begin with my presentation. The city of Los Angeles is here with respect to enforcement of a settlement agreement. The settlement agreement that was signed by the representative of the council. Would you mind speaking up a little? Those microphones do not amplify. The city of Los Angeles is here with respect to enforcement of a settlement agreement. The settlement agreement, which is the subject of litigation, was signed by the representative of the city of Los Angeles on September 27, 2001. And that's a key date. The city contends that the congregation has breached the settlement agreement. First, by demolishing the single family dwelling that was the subject of that settlement agreement. That's the 3,400 square foot single family dwelling that was the subject of the complaint and litigation for a number of years. By building an 8,000 square foot structure in its place, there's no mention of an 8,000 square foot structure in the settlement agreement. And then by not disclosing to the city's representatives. Could you point me to the paragraph in the settlement agreement and release where the congregation was obligated to submit its application for a building permit to the city representative listed in that agreement? The duty here was not to submit the application for a building permit to the city representative. There is no provision in the settlement agreement that calls for that obligation? There is a provision in the settlement agreement that calls for notice and tender. Now that can take performance under the settlement agreement. Please answer my question. What paragraph of the settlement agreement are you urging us to read on an obligation of the congregation to submit their building permit application to the person listed in the settlement agreement? Notice there are numbered paragraphs. Supplemental Excerpt of Record at 61 Settlement Agreement, paragraph 16. Well, I'm thinking of two things. First, the Roman numeral paragraph number 11 of the settlement agreement. What page is that in the supplemental excerpt of record? Okay, in the excerpt of record, it's on page 2132. But I'm also referring to the implied provisions in the settlement agreement. Under California law, there are many contracts, including settlement agreements. Counsel, before you go on to that, is that the only provision that you would rely on in the settlement agreement? I'm looking at Roman 11, form of notice, subparagraph A. Any notice, tender, delivery, or other communication pursuant to this settlement agreement? Yes, that's the provision that refers expressly to Daniel Green. So how do I determine on the basis of this language that communication includes application for a building permit? I don't think we've ever argued that the application for a building permit is a formal form. It's not the application so much as the fact that the congregation had plans to demolish the structure that was the subject of the settlement agreement. Okay. To virtually demolish that. That could be... Given the fact that there's a whole division of the city that processes building permits, and that if you want to get a permit, you have to submit an application to that division of the city. Is your position that this language in the settlement agreement bypasses city ordinance and practice? No, we've never argued that. It would have been sufficient had the congregation in one sentence said, oh, by the way, we're going to demolish the single-family house that's the subject of the settlement agreement. That would have been enough to put the city on notice that the congregation was violating the settlement agreement. In that regard, the point I'd like to make and focus on is that we're talking not only about the express provisions of the settlement agreement, but those by California law which are implied in any contract. Before you go to your implied contractual argument, when you say demolish, would you state exactly what you mean? Was the building razed and rebuilt? I didn't have that impression from the record that that's what happened. So, would you explicate on what you mean by that? As of now, subject to correction, as of now, I think the plans originally called for three exterior walls to remain, for it to be gutted, interior gutted, three exterior walls to remain. I think only two exterior walls finally remained. I don't know if those exterior walls were finally cut down or taken down. There's no doubt that the single family dwelling, 3400 square foot single family dwelling, that was the subject of the complaint, is gone. And that the congregation is putting up an 8,000 square foot or 1100 plus square foot structure in its place. The key fact that I would like to draw your attention to is evidence contained in the exhibits attached to the congregation's request for judicial notice. You know, we just denied a second supplemental request. Did you get the order on that? That's correct. I'm referring to the first one, the one that you granted on the 30th. One issue that was before the court, the district court, but was never really answered, is when did the congregation come up with the plans or the concept or the idea to demolish the single family home that was the subject of the litigation and to put up an 8,000 plus square foot home in its place? Where did that come from? If you look at the request for judicial notice, exhibit seven, we now know that the congregation started having those plans prepared in September of 2001. And that's key because the city signed the settlement agreement on September 27th, 2001. It appears now that in September of 2001, at the inception of the settlement agreement, the congregation already had plans to demolish the single family house that was the subject of the settlement agreement negotiation. Is that your implied covenant of good faith and fair dealing argument? That is correct. Again, we now know from the evidence put in the record by the congregation that plans were prepared, actual architectural plans in September of 2001 that called for the virtual demolition of the house, building of this 8,000 square foot edifice in its place. However, you can see there was nothing explicit in the settlement agreement that prohibited what you call the demolishing of the building. There was nothing, no, there was no need to have anything that prohibited it because the settlement agreement was based on, presumed the existence of the structure that had been the topic of the litigation, the structure that was in the complaint. As of September 27th, 2001, the only structure the city was aware of that had been the subject of the litigation was the single family home that was there. Indeed, the settlement agreement itself makes reference to that single family home. The settlement agreement refers to the fact that the single family use shall be restored and maintained. From the city's perspective, that can only mean one thing, the building that was there. This specific sentence, this is in section Roman numeral 6A, the single family use of the property. Shall be restored and maintained. Located at 303 South Highland Avenue, Hancock Park shall be restored and maintained, including the residential character and architecture, and in accordance with the terms of this agreement. Correct. At that time, and again, it's so disputed, the city didn't know of the congregation's secret plan to demolish that and put up this 8,000 square foot building. Because, Franklin, Ms. Henry, what bothers me about the facts here, it looks to me like we've got an argument that I would expect from a city the size of Los Angeles. The right hand didn't know what the left hand was doing. As I read the record, you had a person in the building department who received an application to process a permit. And somehow that person found out that there had been a dispute and got an assistant city attorney involved. And at some point, a copy of the settlement agreement was obtained, but that this was a different assistant city attorney from the one who had been involved in the negotiating of the agreement. So are you taking the position that the city did not have actual notice that the pendency of this application was in progress at the time that the application was submitted? In September 2001, when we signed the settlement agreement, the city did not. When the congregation, months later, after Dan Green had signed the settlement agreement, when the congregation later started pulling in city building officials and, I believe, a criminal prosecutor, they may have seen the settlement agreement. Who's they? The city building officials. Okay, the people who issued the permit. Yes, the city building officials. Go ahead and do it. Correct. And somebody in your office. A criminal prosecutor from our office. What these individuals didn't know, what they had no insight into, is the negotiations surrounding the settlement agreement. There was no way for them to know that when the city signed the settlement agreement, the city wasn't aware of the congregation's secret plans, the plans that we now know they had at the inception of the settlement agreement. Counsel, is it your position that an 8,000 square foot edifice can never be considered residential? No. Our position is we didn't make that deal. Our settlement agreement dealt with the structure that was there. But it said it should maintain its residential character and architecture. So, there could be an 8,000 square foot building that still maintains a residential character and architecture. Couldn't there be? That is certainly conceivable. But this is where we get into the implied covenant of good faith and fair dealing. That requires the parties to a contract to do that which the other party will presuppose they will do. If all we've ever talked about is the existing structure, the city had no basis for presupposing that the congregation had some secret plans to demolish that structure and put up an 8,000 square foot building. But aren't the plans contained in the application? Again, we've got two things. September 2001 when we entered into the settlement agreement. Then subsequently when the congregation approached those who weren't involved in the settlement negotiations, who had no insight into the settlement negotiations, the building officials, they approached them with the building plans and the settlement agreement as if they went together. Only someone with insight into the settlement negotiations would know. But that person existed, did it not? Daniel Green. And somebody in your office who participated in those negotiations? No, that is incorrect. The attorney involved in our office was never told by the congregation or their representatives, oh, by the way, we have plans to demolish the building. You didn't tell the building permit issue, correct? That is correct. All right. So the city, I think the answer to my question is the city had advance notice through the building permit application that the congregation intended to demolish 4,000 square feet and replace it with 8,000 square feet, correct? The city's building officials did, and I believe one of the criminal prosecutors did. All right. No one involved in negotiations of the settlement agreement did, however. But you had a copy of the settlement agreement in the building permit and in the city attorney's office, and nobody bothered to ask anybody else in their respective offices what's the history behind all this? Only someone who had an insight enough to know that when the settlement agreement was signed, those involved in signing the settlement agreement had no knowledge of the congregation's secret plans. Only someone who had that insight would say, wait a minute, something is going on here. By presuming... Can I just change the position, Ms. Henry? Nobody in the building department approached Mr. Henry, or excuse me, yes, you. Attorney Tai Okupula. Okay, nobody talked to the attorney, and nobody talked to, is it Mr. Green? That is correct. Okay. So we had a breakdown in communication in two offices of city government. No, I don't consider it a breakdown. Our building officials... How about a failure to communicate? I'm not even going to accept that criticism of my client. All right. Our building department issues 10,000 more permits a month. They can't operate on... 10,000 a month that involves settlement agreements. They can't operate on the presumption that whoever's coming in with the application is trying to deceive them, is acting in bad faith. But if they're bringing a settlement agreement, isn't that some indication that they're acting in good faith? They didn't try to hide the fact that there was a settlement agreement. They brought it in. They brought... They not only brought the settlement agreement in, they brought the plans in together, leading someone who didn't have any insight in the negotiations to think what? That they go together. But if someone read the settlement agreement, and there was a provision in the settlement agreement that didn't mesh with the plans, wouldn't that trigger a duty of inquiry? I mean, at what point is the citizen entitled to rely on the efficiency of the municipality? Keep in mind, the congregation knew that the city was not aware of the existence of their secret plan at the time they entered into the settlement agreement. So, the congregation wasn't fooled. The question is whether they could misdirect city employees. Maybe the congregation thought that their action was consistent with the settlement agreement, which is why they brought the settlement agreement in, because everyone would not necessarily agree that an 8,000 square foot building loses its character as a residence. The negotiations... Again, the negotiations in September 2001, they could have mentioned that to Dan Green. Oh, by the way, Mr. Green, even though we don't mention it to you and put it in the settlement agreement, we're going to demolish the only building you know about on the site. They could have mentioned it, but the question is were they required to mention it. Would it be in a person who's not really educated about the building process, would it be in their mind to say, oh, by the way, we're going to do this, if they don't think there's anything wrong with it, why would they bring it up? I wouldn't suggest any naivete in the congregation. They're very sophisticated. Who's been litigating this for years? Mr. Green, I am sort of puzzled that in answer to these questions you do not say, that is why we had Section 11 saying that any notice had to go to Rabbi Rubin or to Daniel Green. That is what we said in our brief. That is what we said. Why didn't you say it here? Why didn't you say it here? Because the city of Los Angeles is what it is, huge and bureaucratic, where the left hand doesn't know it even has a right hand, that we have an agreement here. We entered into an agreement exactly to prevent what happened here. That is correct. We said that any notice will go to Mr. Green. That is correct. Why aren't you making that point? I just wanted to get around to that. That's the best part. To me, that's obvious. The implied covenant of good faith and fair dealing is what I was focusing on. But that's the point we made in our brief. That's the point we made to the district court. Now, in all fairness to the district court, the district court did not have before it the evidence that you now have about what the congregation's plans were at the inception of the settlement agreement. That at the time they had the city signing the settlement agreement to deal with the structure that was there on the lot that was the subject of the complaint. They had these secret plans to demolish that structure and put up an 8,000 square foot building. The difference it makes is simply this. The city had a deal about the structure that was there. If the congregation had wanted a deal about an 8,000 square foot building, in September of 2001, they could have said let's negotiate for it. They didn't. What they are seeking to do is in effect have the district court give them that which they did not negotiate for and that which I think they strongly suspected they would not have gotten. They want to conduct the religious activities that we agreed could be done in the existing 3,400 square foot existing house. They want to conduct those activities in this new 8,000 square foot building that they want to build. That was not the deal we made under the settlement agreement and the settlement agreement should not be interpreted so as to allow that. I have to say, Ms. Henry, I still find it incredible in light of this language in 6A that the person in the signing department who received the building permit application did not walk down the hall to Daniel Green's office and say what does this mean? If the applicant is telling you this is what it means, remember the applicant is presenting them together. It was only someone like Daniel Green who had sufficient insight into the negotiation process to know, oh no, no, no, those building plans and that settlement agreement were never together. When the applicant presents them to a building official who is not an attorney and says here, these go together, the building official says I will take you at your word. You can't blame the city officials for being misled by someone who obviously had plans to mislead. We know that because at the inception of the settlement agreement they had these secret plans. In September of 2001 they didn't disclose to Dan Green when he signed the settlement agreement on behalf of the city. We can't be punished because we didn't catch someone who was obviously committed to fooling us. Thank you. Ms. Azad. Good morning. Susan Azad of Latham and Watkins on behalf of Conversation at Time. Addressing the issue of the notice, when you look at the settlement agreement, it specifically refers to and contemplates plans and permit application will be submitted to the city in Section 6A. And it also requires that those plans be submitted within 90 days. There is no ambiguity whatsoever in the settlement agreement about when those plans, that there will be plans and that they will be submitted within 90 days. The specific requirements that had to be included in the settlement, that were agreed to in the settlement agreement that had to be included in these plans are listed. Double pane windows, maintaining the fence around the property, and removing some concrete paving and replacing it with landscaping. So, if the city had this, which really is an undisclosed intention, that Daniel Green, who is a planning assistant zoning administrator, have some discretionary approval over what would ordinarily be a ministerial building permit, they should have said so in the agreement. Why doesn't Roman numeral 11 subparagraph A address your client's obligation? Because building permits and applications are addressed in a separate section. And if the parties had intended that Daniel Green and Mr. Papoula have a copy of the permit application, it would have been very easy to put. And they shall submit a copy of the permits and plans to Daniel Green and to Tyot Papoula. What's wrong with the language? Any notice, tender, delivery, or other communication pursuant to this settlement agreement shall be in writing and delivered to. The fact that they're addressed in separate provisions of the settlement agreement. And I'll concede, Your Honor, that there's some ambiguity there. So, what the district court did... What's the ambiguity? Well, the... Any communication. Any communication shall be mailed. And permits are supposed to be submitted to the city. Notice is mailed under that provision. And so, when you just... In a plain, common sense reading, it doesn't apply. But also, take a look at... I don't read it that way, counsel. I mean, you negotiate a settlement. Your client negotiates a settlement with the city. Yes. They undertake certain obligations in subparagraph or part six. In part 11, the parties agree that any tender, delivery, notice, or other communication shall be in writing and delivered, mailed, or sent by wire or other telegraphic communication. And then it provides the names of the representatives for each party to whom it should go. Why isn't that clear enough? Because the building permit application is addressed separately in the agreement in a separate provision. The notice provision relates to, for example, if there was an allegation of a breach of the settlement agreement. And you wanted to give notice to the other side. That's what that provision relates to. And the district court, in interpreting this... And also understand that underlying the city's argument here that notice had to be delivered to Daniel Green is the premise that there was some discretionary approval authority over the building permits. That is not reflected in the settlement agreement. If that was the city's intention, it's not in the settlement agreement. And undisclosed intentions are not to be read into contract. Counsel, go ahead. I'm hung up on this point. Maybe you can clarify it for me. But it just seems to me that in 6A, there is an obligation under the settlement agreement to submit any required plan and permit application to the city within 90 days. Correct. And then I go to 11A, and I find that any notice, tender, delivery, or other communication pursuant to the settlement agreement shall be provided to Mr. Green. It doesn't make any sense, Your Honor, given that the building permits were addressed in separate sections. Wait a minute. It doesn't make any sense. This is a settlement agreement of a problem of erecting in a residentially zoned area of Los Angeles a variance to have a synagogue. All right. And there's a settlement agreement entered into. All right? Yes. Do you concede that the settlement agreement was a contract? Absolutely. And do you agree that parties to a contract may agree on a method of giving notice of what they desire to implement? Absolutely, Your Honor. And do you agree that the settlement agreement talked about restored and maintained? I do, Your Honor. All right. Now, how do you move from restored to maintained to demolishing? Demolishing and leaving up only two walls. Now, don't you think that that is considering the spirit, the spirit of the settlement, at a minimum the congregation should have talked to Mr. Green before they went through the building inspector's office? No, Your Honor. And let me explain why. Okay. All right. Go ahead, please. Okay. The construction work that was done was a remodel. And it is completely consistent with the R1 zoning in terms of the size of the structure, in terms of the setbacks. All right. Okay, okay. Okay. Except everything you're about to say. But is demolishing equivalent to restored and maintained? The settlement agreement contemplates that there will be a remodel. Now, whether, there is no evidence, and I don't believe it's true, that there was any secret intention to demolish the structure. But any homeowner can remodel, and remodels are done all the time. And I don't think there was ever any belief or intention that remodeling this house and putting in the requirements, you know, the double stained windows, was in any way in violation of the settlement agreement. And the other point I'd like to make. You take two lay people, two lay people, and get two lay people to interpret this contract. Do you think that when you say demolished is equivalent to restore and maintain? It was a remodel. There was some demolishing and some of the structure remained. It was proper in the settlement agreement, as I say, remodeled. It contemplates that there will be building permits. And, you know, you're probably right in terms of it does not actually refer to the word remodel. In paragraph 6A. Can I make, there's one critical point here, Phil, that I really do need to make. And that is that when you're talking about terms of the settlement agreement that are ambiguous, what a court can do is look to the conduct of the party, and that's what the district court did here. And, in fact, the district court. I'm sorry. I misspoke. The word was restored. Right. Instead of remodeling. Right. I'm sorry. It's my mistake. It was not your mistake, Your Honor. The critical point here is that the district court, in looking at the conduct of the parties themselves, to see how they interpreted the settlement agreement, based upon substantial evidence in the record, found that the parties themselves, there is no restriction in the settlement. The settlement agreement does not say you cannot rebuild this house to 8,000 square feet. It does not say this house must stay the same size. It doesn't address size at all. What's the ambiguity in the contract? In terms of what does residential character mean, and is the 8,000 square foot house that's being built there, does that violate the settlement agreement? And the reason the district court found, and also talking about the notice provision, there were some events that happened that caused the district court to believe that neither the city nor the congregation interpreted the settlement agreement as a requiring notice or approval of Daniel Green, or that the remodel violated the settlement agreement. In fact, what happened was, in terms of the notice, the city attorney called me in January, after the permits had been submitted, and requested a copy of the plan, which I sent to him along with a copy of the settlement agreement. That city attorney went through the plans, called me back, and said you need to change this. I don't believe it's consistent with the settlement agreement, and we did. In addition, we did offer the plans to Mr. Papoula in February of 2002, before the permit application was granted, and Mr. Papoula said no, I do not need them. I can get them elsewhere. In addition, and that's at the supplemental administrative record page 26, and in terms of my transmittal letter to the other city attorney, that's the administrative record 2118. In addition, when Rabbi Rubin submitted the plans to the building department, he received a call from the building department requesting a copy of the settlement agreement. He gave the building department a copy of the settlement agreement. He took his engineer in with him, and they sat down, and they went page by page through the plans and through the settlement agreement to make sure that they were consistent. The plans on their face stated that the remodel, the total would be 8,150 square feet, and if you want to look at the permit, it's at the supplemental administrative record page 88. Now, and in terms of going through page by page, that supplemental administrative record, page 38-39, it's the declaration of Rabbi Rubin at paragraph 5-7. Now, when the permit issued, it specifically references the settlement agreement, and that's at the supplemental administrative record page 89. Including the notice provision. What the permit says is, as per the settlement agreement, these are the requirements, and they're met, and the requirements were the double-pane windows, the concrete removal, and the landscaping, and the fence. Well, Captain, in all fairness, it says, pursuant to the settlement agreement, section 6. It does not reference section 11 at all. Correct. What the district court found was that the city had actual notice. The lawyers had notice. The building department had notice. They sat down, and they went all through the settlement agreement. The other lawyers had the opportunity. You know, certainly from our perspective, we thought we'd done everything and gone over and above in terms of making sure that everybody had all of the plans, had the settlement agreement, and could go through. It never, in terms of the size of the building, that's a ministerial permit. It never occurred to us that the city would take a position after it issued the building permit that that somehow violated the settlement agreement. Counsel, you take issue with opposing counsel's representation that everybody knew in the settlement agreement they were talking about the 3,000 square feet. Absolutely, I take issue with that. That's not reflected anywhere in the settlement agreement. It certainly was never my understanding. And that's what the district court found. And I think the other thing that is important here, in terms of taking a look at whether the justifications that the city puts forward are really real or not, because they're not expressed in the settlement agreement. It's just a sequence of events. You've got the demolition starting on June 4th, the permit issue in March. June 4th, the demolition starts. On June 7th, there's an email from the homeowner, and that's at the supplemental administrative record, page 97, that says, we're asking Tom LaBonge to immediately ask the city attorney to put a stop work order in place for this expansion. Three days later, a stop work order was issued. The basis for that stop work order was what they called an illegal demolition. It turns out that the demolition was not illegal, that no demolition permit was required, because it was listed in the plan, and that's at the supplemental administrative record, page 69. What happened after that when the congregation tried to get basically a rubber stamp approval, the city couldn't meet with us. They were too busy. It wasn't until two weeks. Okay, I understand that. I want to ask you this question, counsel. On the expression, is something dealing with the building permit, put this way, the building permit related to restoring and maintaining the single family use. Is that right? No, the requirement of the settlement agreement is that the house be residential in character and architecture. The original structure the prior owner had put in had paved the front yard. You're giving just the subject of the question. Sorry. I have it before me. Okay. Now, the question is, would you say that that is pursuant to the settlement agreement? I'm sorry, I missed your question. All right. When I use the expression, the single family use of the property shall be restored and maintained. Correct. Would you say that that is pursuant to the settlement agreement? Absolutely, yes. All right. So I come to form of notice, any notice, tender, delivery, or other communication pursuant to the settlement agreement, so forth and so on, and making the reference. Now, what is surprising to me that the congregation or the attorneys with this project did not consult or even notify Mr. Green? Why? Because we didn't believe it was required. It is a separate part of the settlement agreement, and it was our interpretation. It wasn't required. Correct. Now, what does the record show of the length of time of the negotiations leading up to this settlement agreement? The settlement agreement, the original negotiations began on approximately June 5th or June 9th. It was pursuant to a year of 2001. It was pursuant to a court-ordered settlement conference. June, did you say? Of June. All right. So the congregation, the officers of the congregation, and I take that the council of the congregation, were involved from June to September 27th when the settlement agreement was signed. Let me kind of put it in context for you. The way that the settlement negotiations took place was they were actually in front of the magistrate judge. So there was a hearing in June. There was a hearing in August where we actually came to an agreement. So it was, you know, in terms of the actual face-to-face negotiations, maybe four or five or six hours in front of the magistrate. Was Mr. Green a participant in these negotiations? I cannot remember. He may have been present in the courtroom for the August meeting. It was mostly the primary negotiators were me and Mr. Papula working with the magistrate. And Rabbi Rubin was there and Renee Weitzer and I believe Mr. Chan from the building department was there. Why was Mr. Green's name included in the settlement agreement? I don't know, Your Honor. You don't know. No. I will say I do believe that Mr. Chan, who is part of the building department, was. And I may be misremembering, but I believe he may have been there. Wasn't he a principal officer in the city of Los Angeles dealing with variances to zoning ordinances? Mr. Green? Yes. Mr. Green, I believe, is an assistant zoning administrator. He's what? I believe he's an assistant zoning administrator. Yes. And I will also say that had the city insisted that any remodel of the structure be subject to, which would ordinarily be a ministerial permit, be subject to zoning administrator discretionary review, we would not have agreed to the settlement agreement. We had been in four years of intense litigation. We had originally applied for a conditional use permit. We had been denied. We had been in court for years. And that would have been absolutely unacceptable. So the premise that Mr. Green had authority to address discretionary authority of these permits, I mean, that would have been a deal breaker for us. Well, the notice provision doesn't necessarily imply that he would have approval, just knowledge so that he could perhaps track it and take it to the appropriate people to determine whether or not the settlement agreement had been breached. That may well be true. What the city is arguing is that Mr. Green somehow had discretionary authority over that. And again, I would say based upon the record here, the city had actual knowledge of the settlement agreement. The city spent three months going through the settlement agreement, going through the plans. There was nothing concealed here in terms of what we were attempting to do. And so in terms of how the parties themselves viewed the settlement agreement, the district court found that there was no violation because there had been not a violation of the notice provision and that the city had approved the size of the house in issuing the building permit. And the congregation was justified in relying on that in beginning the construction work. Thank you. Ms. Henry, you have just a quick comment. I'll be quick. Mr. Papoula is seething over there with the suggestion that he had some knowledge that they planned to demolish the single family house and put up this 8,000 square foot dwelling. Counsel for congregation never advised Mr. Papoula of that. You didn't talk to the other person in your office who was given that? Not prior to the issuance of the building permits and plans. Number two, there was never any suggestion that Mr. Green needed notice to come up with some discretionary approval. He was the city's contact person with respect to the negotiations and the settlement agreement. He had given a deposition, I believe, earlier in the litigation. And you disagree with the representation of counsel saying that she didn't remember him participating very much at all? We've been litigating this a long time. She may not remember Mr. Green, but Mr. Green did participate in the litigation. By the way, Mr. Green is in the planning department. He is a senior official in the planning department. He is not in the building department. As a zoning administrator, he wouldn't ordinarily just talk with the building officials unless there were something particularly involved. Let me just say, the city agreed to the settlement agreement in good faith. The only building we knew about in the negotiations was the structure that was there. The improvements, the construction work that's listed in the settlement agreement, that relates to, expressly relates to the 3400 square foot building. If you go back to the complaint, in the complaint that was filed that began this lawsuit, the congregation indicates that it is willing to put double paning in the windows of that building to take care of the fencing and to take care of the landscaping. It all related to that existing building. If the congregation wanted the city to know that it planned to demolish that structure and put something up that was 8,000 square feet tall, 8,000 square feet, they could have done that in September of 2001. They could have done it. They didn't do it. One must infer that they didn't want someone who had insights into the negotiations to know what their plans were. Going to building officials, going to criminal prosecutors, presenting plans to them, talking to them, doesn't get you to those who have insights into the negotiations who know that they don't go together. Thank you. The case just argued is submitted.
judges: Aldisert, Tallman, Rawlinson